**LONGVIEW BANK & TRUST COMPANY, Appellant,**

v.

**James R. FLENNIKEN, et ux., Appellees.**

**No. 1472.**

Court of Appeals of Texas, Tyler.

Nov. 24, 1982.

Wm. J. Gardner, Longview, for appellant.

Clifton Holmes, Longview, for appellees.

SUMMERS, Chief Justice.

Our former opinion in this case is withdrawn and the following substituted therefor.

This appeal arose from a suit brought under the 1977 version of the Texas Deceptive Trade Practices Act[1] by the plaintiffs/appellees, Mr. and Mrs. James R. Flenniken (the Flennikens) against the defendant/appellant, Longview Bank & Trust Company (the Bank). The case was tried to a jury which answered special issues in favor of the Flennikens. Based on the jury's answers, judgment was rendered for the Flennikens, and the Bank appeals.

Reversed in part, judgment modified and as modified, affirmed.

The essential facts leading up to this lawsuit are not in dispute.

On October 28, 1976, the Flennikens entered into a builder's and mechanic's lien contract with Charles Easterwood (contractor) for the construction of a residence on property which the Flennikens owned in Gregg County. Under this agreement, the contractor was paid $5,010 in cash, and the Flennikens executed a mechanic's lien note in the amount of $42,500. On this same day, October 28, 1976, the contractor transferred the note and the lien to the Bank. As further security for the note, the Flennikens executed a deed of trust on their lot naming the bank's vice president, J.M. Bell, as the trustee.

Between October 28, 1976, and early January 1977, the contractor received disbursements from the Bank totalling $32,000. These disbursements were made by the Bank upon the request of the contractor. The Bank admitted it never made on-site inspections before releasing the funds, and the Flennikens were never asked by the Bank to approve the draws. Apparently the contractor diverted most of these funds to purposes other than the construction of the Flennikens' house, because the house was only 20% complete after $32,000 was withdrawn. Thereafter, the contractor abandoned the project. He was later con-

---

1. Tex.Bus. & Comm.Code, § 17.41 et seq. (Vernon 1977); hereinafter referred to as the DTPA.

victed of misapplication of construction contract trust funds and sentenced to five years in prison. The contractor further filed for bankruptcy.

The Flennikens and the Bank attempted to reach some sort of compromise on what to do with the unfinished house. When no agreement could be reached, the Bank foreclosed on the property on December 6, 1977. Later the lot and the partially completed house were sold to another contractor. In response to this action, the Flennikens sued the Bank alleging that the foreclosure was wrongful and a violation of the DTPA in that it was an unconscionable action. The jury agreed with the Flennikens' position and found that the Bank's foreclosure constituted an unconscionable action.[2] Damages were assessed at $8,658.00 which the trial court trebled in accordance with §· 17.50(b)(1) of the DTPA. Attorneys' fees and court costs were also awarded to the Flennikens.

Under its first three points of error the Bank asserts that as a matter of law the Flennikens were not "consumers" for the purposes of bringing suit under the DTPA, and, therefore, treble damages and attorneys' fees should not have been awarded.

■ It is settled in Texas that in order to maintain a private cause of action under the DTPA, the complaining party must qualify as a "consumer" as defined in § 17.45(4).[3] *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). Two requirements must be satisfied in order to qualify as a consumer. First, the person must have sought or acquired goods or services by purchase or lease for use. Second, the goods or services purchased or leased must form the basis of the complaint. *Cameron v. Terrell and Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981).

■ In the case at bar, the Bank argues that the Flennikens sought neither "goods" nor "services" from the bank and, there-

fore, cannot qualify as "consumers." The *Riverside Nat'l Bank* case, *supra,* is cited as authority for this position. In that case the plaintiff's cause of action was predicated on the bank's refusal to lend him money after bank officials had indicated the loan would be made. The Supreme Court held that the plaintiff could not qualify as a "consumer" under the DTPA because he did not seek to acquire a good or service from the bank. Rather, he sought to acquire money, or the use of money, which is neither a "good" nor a "service" for DTPA purposes.

The court in *Cameron* stated:

If either requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress.

\*   \*   \*   \*   \*   \*

The act is designed to protect consumers from any deceptive trade practice *made in connection with the purchase* or lease of any goods or services. (Emphasis added.)

In the instant case, the trade practice alleged to be deceptive was the unlawful foreclosure by appellant bank. Such foreclosure did not occur *in connection with the purchase* of the house by the Flennikens from Easterwood; rather it occurred at a subsequent date independent of the house purchase transaction. The action of the bank in prematurely foreclosing, rather than an act done in connection with the purchase of the house, formed the basis of the Flennikens' complaint in the case at bar. Accordingly, the Flennikens do not qualify as consumers of a good from the bank under the requirements set forth in *Cameron* or *Riverside.*

We feel the case of *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex.1982) is distinguishable from the instant case. In *Knight,* the plaintiff sought to purchase a truck from Etex, a

---

**2.** The issue of unconscionability is not before us on appeal. Since the trial, the Bank has admitted its foreclosure was wrongful and has not challenged the unconscionability finding of the jury.

**3.** "Consumer" means an individual ... who seeks or acquires by purchase or lease, any goods or services.

retail dealer of trucks and machinery. The sales contract used in that case prominently bore the insignia of IHCC at the top of the first page. The "Additional Provisions" on the reverse side contained a preprinted clause assigning the contract to IHCC. IHCC drafted and supplied the contract signed by Knight, and, in fact, provided most of the contracts used by Etex in the sale of its vehicles. The contract signed by Knight provided both for the sale of the truck and the payment over time with interest. In *Knight,* there was a single transaction, the sale of a truck on an installment basis. The Supreme Court held that Knight was a consumer as to Etex in that he was seeking to purchase a truck which is clearly a "good" under the DTPA. The court further held that Knight, as a consumer, could assert a DTPA claim against IHCC because Etex and IHCC were so inextricably intertwined in the transaction as to be equally responsible for the conduct of the sale. *Knight, supra* at 389.

The reasoning in *Knight* is not controlling under the facts of the instant case. Here the Flennikens sought to purchase a home which is a "good" under the DTPA.[4] The bank was not a party to the original builder's and mechanic's lien contract between the Flennikens and Easterwood. The Flennikens contracted for the construction of a house by Charles Easterwood and in such transaction were "consumers." However, the assignment to the bank amounted to another transaction, that of interim construction financing and did not result in the Flennikens being awarded goods or services from the bank. In *Knight,* the transaction was not severable but was a single transaction. Based on these facts we cannot hold that the bank was equally responsible with the contractor under the builder's contract. From the evidence adduced at trial we hold that the Bank was not inextricably intertwined with the contractor and that the Flennikens were not "consumers" as to the Bank. Appellant's points one, two and three are sustained.

4. Section 17.45 defines "goods" as "tangible chattels or *real property* purchased or leased

In its fourth point, the Bank argues the trial court coerced a jury verdict on special issue number three which asked the jury if the Bank's conduct was unconscionable.

After deliberating for four hours, the foreman of the jury advised the trial court that the jury appeared to be deadlocked, by an 8 to 4 vote, on special issue number three. In response, the trial judge gave the jury the following supplemental charge in writing:

I have your note that you are deadlocked. This case has been ably tried, and in the interest of justice, if you could end this litigation by your verdict, you should do so. I don't mean to say by that that any individual person on the jury should yield his own conscience and positive conviction, but I do mean that when you are in the jury room, you should discuss this matter among yourselves carefully and listen to each other, and try, if you can, to reach a conclusion on the issues. It is the duty of jurors to keep their minds open and free to every reasonable argument that may be presented by fellow jurors that they may arrive at the verdict which justly answers the consciences of the individuals making up the jury. A juryman should not have any pride of opinion, and should avoid hastily forming or expressing an opinion. He should not surrender any conscientious views founded upon the evidence unless convinced by his fellow jurors of his error.

I am satisfied, ladies and gentlemen, that you have not deliberated sufficiently. Accordingly, I return you to your deliberations. If you wish to recess for the evening and continue your deliberations tomorrow, you may do so.

Shortly after this instruction was given, the jury was released for the night. The jury deliberated for two and a half hours

for use."

the next day and then requested further definition of the definitions given in special issue three. The trial judge, in effect, refused the jury's request and invited its attention back to the original charge. Less than an hour later the jury broke for lunch. Shortly after lunch the jury returned a 10–2 verdict in favor of the plaintiffs.

At the hearing on defendant's motion for new trial, the Bank called one of the jurors, Elizabeth Rives, who testified that she was one of the original four jurors who did not believe the Bank's conduct was unconscionable. However, she finally changed her vote on that issue because she felt she was not "going to get to leave until we all did change our vote." She said she did not change her vote because she felt the Bank's conduct was unconscionable.

The Supreme Court held in *Stevens v. Travelers Ins. Co.,* 563 S.W.2d 223 (Tex. 1978), that a similar supplemental charge under similar circumstances did not have a coercive effect on the jury. We likewise hold that the charge in the case before us was not coercive. Moreover, the judge polled the jury and ten of the jurors, including Mrs. Rives, affirmed it was their verdict. If there was a reservation to the contrary in the mind of some juror, it cannot now be considered. *Jones v. Square Deal Cab Co.,* 506 S.W.2d 855 (Tex.1974). Appellant's fourth point is overruled.

In its fifth and sixth points of error, the Bank argues that the trial court erred in allowing the Flennikens to call the Bank's former vice president, J.M. Bell, as an adverse witness.

As previously stated, Mr. Bell was the Bank's vice president at the time the contractor and the Flennikens entered into their contract. Mr. Bell approved the contractor's loan and, further, was the original trustee in the Flennikens' deed of trust. By the time the case came to be heard, Mr. Bell had left the Bank's employment and was serving as the president of another Longview bank.

Rule 182, Tex.R.Civ.P., permits the calling of an adverse party as a witness.

Under the rule, the calling party is not bound by the witnesses' testimony, and may impeach and lead the witness as on cross-examination. The rule, however, has been interpreted to preclude such examination when the connection of the officer, agent or employee has been severed from the party-corporation. *Weingarten, Inc. v. Hochman,* 487 S.W.2d 159, 162 (Tex.Civ.App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.); *Thomas v. Magnolia Chem. Co. of Texas,* 394 S.W.2d 50, 57 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.). That is, once the individual leaves the employment of the corporation, that individual may no longer be called under the adverse party rule. While it was error for the trial court to allow Mr. Bell to be called to testify under Rule 182, we hold that such error is harmless as it has not been demonstrated to us that such error reasonably or probably resulted in an improper verdict in this case. Rule 434, Tex.R.Civ.P.

We have carefully considered the Bank's remaining points of error. We find each of them to be without merit, and they are overruled.

We accordingly reverse those parts of the court's judgment which trebled the jury's award of $8,658.00 as actual damages and also provided for plaintiffs' recovery of attorney's fees. To reflect this action, the sum of $17,316.00, together with all sums awarded as attorney's fees, are deducted from plaintiffs' recovery and the trial court's judgment is modified to provide that plaintiffs James R. Flenniken and wife, Betty Flenniken, have and recover of and from the defendant Longview Bank and Trust Company the sum of Eight Thousand Six Hundred Fifty-eight Dollars ($8,658.00), with interest thereon at the rate of nine (9) percent per annum from date of judgment until paid, together with all costs of court in this behalf expended.

As so modified, the trial court's judgment is affirmed.